IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BRUCE E. MCLEOD, *et al.*,           §
                                      §
        Plaintiffs,                   §
                                      §
v.                                    §     Civil Action No. 3:16-CV-1484-N-BQ
                                      §
PERSHING, LLC,                        §
                                      §
        Defendant.                    §

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendant Pershing LLC's ("Pershing") motion for summary judgment [50]. For the reasons stated below, the Court grants summary judgment on Plaintiffs McLeod, *et al.*'s ("Plaintiffs") breach of third-party intended beneficiary contract claims and denies summary judgment on all Plaintiffs' fraud and aiding and abetting fraud claims.

## I. THE ORIGINS OF THE DISPUTE

This case arises out of R. Allen Stanford's infamous Ponzi scheme. The facts associated with Stanford's scheme are well established, *see, e.g., Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188–89 (5th Cir. 2013), and will not be recounted in great depth here. In short, Stanford's scheme entailed the sale of fraudulent certificates of deposit ("CDs") through an offshore bank located in Antigua, known as Stanford International Bank Limited ("SIBL"). Although Stanford represented to investors that the CD proceeds were invested only in low-risk, high-return funds, in reality the

MEMORANDUM OPINION AND ORDER – PAGE 1

proceeds were funneled into speculative real estate investments and used to fund Allen Stanford's extravagant lifestyle. On February 17, 2009, the Securities and Exchange Commission ("SEC") issued a report charging Stanford and his entities with fraud.

Plaintiffs, a group of Stanford investors, initially filed suit against Pershing in federal court in New Jersey. Complaint [1]. The JPML transferred the case to this Court, and it is one of many actions based on similar factual allegations. Plaintiffs seek damages based on investments in fraudulent certificates of deposit they purchased through Stanford Group Company ("SGC"). Plaintiffs allege that SGC's brokerage accounts were cleared by Pershing (SGC's clearing firm). Plaintiffs further allege that in doing so Pershing provided material assistance to Stanford's scheme. This allegation is the basis for their claims against Pershing for common-law fraud, aiding and abetting fraud, and breach of third-party intended beneficiary contract.

Plaintiffs are not the only Stanford investors to assert claims against Pershing for its alleged involvement in Stanford's scheme. Notably, a group of Stanford investors sued Pershing on behalf of a putative class in *Turk v. Pershing*, Case No. 3:09-CV-2199-N (N.D. Tex., filed Nov. 18, 2009) (the "*Turk* Case"), asserting claims for violations of the Texas and Florida securities acts, respectively. Plaintiffs here were included in the original putative class definition in the *Turk* Case. The *Turk* plaintiffs first sought class certification on May 14, 2010. On June 25, 2010, the *Turk* plaintiffs stipulated to a narrowed class definition that excluded some original putative class members. *See* Pls.' Mot. Class Cert. Reply at 8 [48], in *Turk*. Plaintiffs initiated the instant action on May 5, 2016. Class certification in the *Turk* Case was ultimately denied on March 21, 2019. [198], in *Turk*.

MEMORANDUM OPINION AND ORDER – PAGE 2

Now, Pershing moves for summary judgment on all of Plaintiffs' live claims, arguing that Plaintiffs filed their complaint too late, that Plaintiffs' responses to Pershing's Requests for Admissions are admitted pursuant to Federal Rule of Civil Procedure 36, and that Plaintiffs cannot establish the elements of their claims for breach of third-party intended beneficiary contract, fraud, or aiding and abetting fraud.

## II. SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, he "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [his] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to judgment by either (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

MEMORANDUM OPINION AND ORDER – PAGE 3

Once the movant has made the required showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'"  *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III.  THE RFAs PERSHING SERVED ON PLAINTIFFS ARE NOT DEEMED ADMITTED

As a threshold matter, Pershing asks the Court to deem the RFAs it served on Plaintiffs admitted pursuant to Federal Rule of Civil Procedure 36(a), and grant summary judgment on all claims based on those admissions.  Def.'s Br. 17–18 [50-1].  The Court declines to do so.  Pershing served its RFAs on Plaintiffs on October 8, 2018.  Def.'s Br. 17; PER_APP_2618, 2640, 2653 [50-2].   On November 1, 2018, Plaintiffs' counsel emailed Pershing's counsel requesting a thirty-day extension of time beyond the November 8, 2018, deadline to respond to the discovery requests and effectively push back the December 5, 2018, discovery deadline.[1]  Pl_App_0609 [62-4].  Defense counsel agreed.  *See id.*; PER_SUP_APP_85.  Plaintiffs' RFA responses were served on December 10,

---

[1] The Scheduling Order in effect at that time stated that the parties could agree to alter the discovery close deadline by written agreement without a court order.  *See* Scheduling Order ¶¶ 4, 4(e) [36].

2018,[2] with the exception of one plaintiff.[3]   Def.'s Br. 17–18.  Still, Pershing contends that the responses are untimely, and the discovery deadline was not extended because no motion to extend time was filed.  Def.'s Reply 24 [67].

However, the emails produced by Pershing show that defense counsel contacted Plaintiffs' counsel on November 7, 2018, noting that "the parties can modify the close of discovery and the 'all motions' deadline absent court approval," and stating that they were "amenable to a 30-day discovery extension in McLeod, which moves the close of discovery from December 5, 2018, to January 4, 2019."  PER_SUPP_APP_087 [67-1].  The email also specifies that the trial ready date and pretrial materials deadlines should also be moved, which would require leave of court, and that defense counsel could circulate a joint draft motion to amend the scheduling order.  *Id.*  According to Pershing, Plaintiffs' counsel did not respond.  Def.'s Reply 24.  Even so, given the emails demonstrating the parties mutually agreed to extend the deadline for Plaintiffs to respond to the RFAs, the Court will not deem the RFAs produced on December 10, 2018, admitted.  *See MidCap Media Fin., LLC v. Pathway Data, Inc.*, 2017 WL 9323448, at *5 (W.D. Tex. 2017) (declining to find party's RFA responses untimely because the parties agreed to an extension via email).[4]

---

[2] December 10, 2018, is the first business day after Saturday December 8, 2018, the deadline to respond to the RFAs after the agreed thirty-day extension.

[3] Pershing requests that Plaintiff Eric Challain's claims be dismissed with prejudice for failure to comply with discovery requests.  Def.'s Br. 19, n.7.  Plaintiffs responded that Challain did not wish to pursue his claims and instead filed a notice of voluntary dismissal.  Pls.' Resp. 36, n. 41.  No such notice was filed in the instant case.  Thus, the Court now dismisses Eric Challain's claims against Pershing with prejudice.

[4] At this stage, the Court denies Pershing's request to dismiss all claims of Plaintiffs Steven Higginbotham, David and Janet Gallasi, Robert Gold, the Reid Family, LLP, and the Estate of Lloyd Chism on the basis that they sold their rights deriving from SIBL CD purchases,

## IV. THE COURT GRANTS SUMMARY JUDGMENT ON PLAINTIFFS' BREACH OF THIRD-PARTY INTENDED BENEFICIARY CONTRACT CLAIMS

Plaintiffs' breach of third-party intended beneficiary contract claims stem from allegations that they were intended beneficiaries of Pershing's contracts with the Financial Industry Regulatory Authority ("FINRA") and the SEC, including NASD and FINRA Member Agreements, and that Pershing breached those agreements "by failing to comply with its contractually-imposed obligations."  Complaint ¶ 100–01.  Specifically, that "Pershing violated governing state and federal laws and securities rules and regulations which thereby perpetuated the Stanford Ponzi scheme . . . ."  *Id.* at ¶ 101.  To prevail on their breach of third-party intended beneficiary contract claims, Plaintiffs must establish both the elements of breach of contract and, additionally, that Plaintiffs were intended beneficiaries of the allegedly breached agreements, meaning "the contracting parties intended that the [Plaintiffs] benefit from the existence of the agreement[s]."  *Marina Group LLC v. Shirley May Intl. US Inc.*, 2022 WL 17622679, at *5 (D.N.J. 2022), reconsideration denied, 2023 WL 5013455 (D.N.J. 2023) (citing *Ross v. Lowitz*, 120 A.3d 178, 189–90 (N.J. 2015)).

Pershing argues that there is no evidence on the record "that Plaintiffs were intended beneficiaries of these agreement[s]," that Pershing breached the agreements, or of any

---

and thus their right to sue Pershing, prior to this suit.  Def.'s Br. 19–20, n. 7.  Plaintiffs, pointing to substantially the same evidence, argue that the purchase agreements Pershing references include "specifically defined and agreed to exception[s] or 'carve out[s]'" retaining those Plaintiffs' rights to sue Pershing.  Pls.' Resp. 36.  As such, a genuine dispute of material fact exists on this issue.

causal damages related to the alleged breaches.  Def.'s Br. 37.  Thus, to survive summary judgment, Plaintiffs must point to evidence that establishes a genuine dispute of material fact regarding each element of their claims.  They have not done so.  Because Plaintiffs have not answered Pershing's no-evidence assertions, the Court grants Pershing's motion for summary judgment on all Plaintiffs' breach of third-party intended beneficiary contract claims.  *See Celotex*, 477 U.S. at 322–23; FED. R. CIV. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, . . . the court may consider the fact undisputed for purposes of the motion.").

## V. PLAINTIFFS' AIDING AND ABETTING FRAUD AND INDIRECT FRAUD CLAIMS ARE NOT TIME-BARRED AS A MATTER OF LAW

Pershing argues that Plaintiffs' claims are time-barred by New Jersey's six-year statute of limitations.[5]  Under New Jersey law, both fraud and aiding and abetting fraud

---

[5] This Court applies the choice of law rules of the transferor court, the United States District Court of New Jersey.  *See Smith v. Waste Mgt., Inc.*, 407 F.3d 381, 384, n.1 (5th Cir. 2005); *see also In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) ("When considering questions of state law [in a multidistrict litigation], the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation.").  In diversity cases, federal courts "apply the choice-of-law rules of the forum state."  *See Scott v. PNC Bank, Natl. Assn.*, 785 Fed. Appx. 916, 919 (3d Cir. 2019) (quoting *Pac. Emps. Ins. Co. v. Glob. Reins. Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012).  New Jersey applies the Second Restatement of Conflict of Laws approach to resolve choice of law issues with respect to the statute of limitations and substantive tort law.  *See McCarrell v. Hoffmann-La Roche, Inc.*, 153 A.3d 207, 210 (N.J. 2017); *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008).  Under the Second Restatement framework, the Court determines New Jersey's statute of limitations and substantive law apply to Plaintiffs' claims.  *See McCarrell*, 153 A.3d at 224 (applying New Jersey statute of limitations to Alabama-plaintiff's claims because Alabama's relationship to the dispute was not more significant than that of forum-state New Jersey); *Camp Jaycee*, 962 A.2d at 461–68; *see also In re Accutane Litig.*, 194 A.3d 503, 517–24 (N.J. 2018) (finding that New Jersey had

claims are subject to a six-year statute of limitations.  N.J.S.A. § 2A:14–1; *see generally S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) (applying New Jersey statute of limitations to fraud claim); *Smith v. CitiMortgage, Inc.*, 2016 WL 8673066, at *5 (D.N.J. 2016) (applying New Jersey's six-year statute of limitations to aiding and abetting fraud claim).  Plaintiffs filed the instant action on May 5, 2016.  The parties dispute when Plaintiffs' claims accrued and whether class action tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), applies to Plaintiffs' claims, both of which bear on when the statute of limitations on Plaintiffs' claims expired.  For the foregoing reasons, the Court cannot find Plaintiffs' claims untimely as a matter of law and denies summary judgment on statute of limitations grounds.[6]

### A. Reasonable Minds Could Differ As To When Plaintiffs' Claims Accrued

Pershing contends that Plaintiffs' May 5, 2016, complaint is untimely because Plaintiffs were or should have been aware of their claims against Pershing on or about

---

the most significant relationship to the occurrence and parties in a suit brought by plaintiffs from 44 jurisdictions against New Jersey defendant, "overcoming section 146's presumption that the law of the place of injury governs").

[6] The Court likewise denies Pershing's request for a *Lopez* hearing.  Under New Jersey law, "[t]he application of the discovery rule is for the court, not a jury, to decide," typically at a pre-trial *Lopez* hearing.  *Catena v. Raytheon Co.*, 145 A.3d 1085, 1090 (N.J. Super. Ct. App. Div. 2016) (citing *Lopez v. Swyer*, 300 A.2d 563 (N.J. 1973)).  However, the Third Circuit, in applying the *Erie* doctrine, held that "the federal policy favoring jury decisions of disputed fact questions must prevail over the state practice of allocating to the court the decision as to the time of discovery of the cause of action."  *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).  Accordingly, "the *Lopez* procedure of having the judge resolve discovery rule issues via an evidentiary hearing does not apply in federal court."  *Diaz v. C.R. Bard, Inc.*, 2023 WL 3452667, at *6, n.6 (D.N.J. 2023) (citing *Goodman*, 534 F.2d at 571–73).

February 17, 2009, more than six years before Plaintiffs filed suit.  Def.'s Br. 11.  On the other hand, Plaintiffs argue that the discovery rule delayed the accrual of their claims until the *Turk* Case was filed on November 18, 2009.  Pls.' Resp. 28 [62-1].  New Jersey's "discovery rule" acts as an equitable exception to the statute of limitations.  *See S. Cross Overseas Agencies, Inc.,* 181 F.3d at 425 (fraud); *Catena v,* 145 A.3d at 1090 (fraud); *Blystra v. Fiber Tech Grp., Inc.*, 407 F. Supp. 2d 636, 645 (D.N.J. 2005) (aiding and abetting fraud).  The discovery rule tolls the accrual date of a claim in situations where "the injured party either does not know of his injury or does not know that a third party is responsible for the injury." *Ben Elazar v. Macrietta Cleaners, Inc.*, 165 A.3d 758, 764 (N.J. 2017).  When it applies, the discovery rule "delays accrual of the action until the plaintiff discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." *Henry v. N.J. Dep't of Human Serv.'s,* 9 A.3d 882, 892 (N.J. 2010) (internal citation and quotation marks omitted).  The party seeking to invoke the discovery rule has the burden of establishing it applies.  *Catena*, 145 A.3d at 1090 (citing *Lopez*, 300 A.2d at 563).

Under New Jersey law, the applicability of the discovery rule turns on an objective inquiry — "whether the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another," so as to warrant starting the statute of limitations running.  *Caravaggio v. D'Agostini*, 765 A.2d 182, 187 (N.J. 2001).  New Jersey courts have clarified that "where a plaintiff knows of an injury and that the injury is due to the fault of another, he or she has a duty to act. *Ben Elazar*, 165 A.3d at 767–68 (quoting *Caravaggio*, 765 A.2d at 189).  In contrast, when a plaintiff

MEMORANDUM OPINION AND ORDER – PAGE 9

"know[s] they have suffered an injury but do[es] not know that it is attributable to the fault of another, . . . her cause of action does not accrue until she has knowledge of the injury and that such injury is the fault of another." *Caravaggio*, 765 A.2d at 187.  Furthermore, in situations where "a plaintiff knows of an injury, and knows that it is the fault of another, but is reasonably unaware that a third party may also be responsible, the accrual clock does not begin ticking against the third party until the plaintiff has evidence that reveals his or her possible complicity." *Id.* at 189.

Pershing maintains that Plaintiffs were or should have been aware that they were defrauded on or about February 17, 2009, when the SEC announced it had brought charges against the Stanford Entities.  Def.'s Br. 11.  In support of this contention, Pershing highlights the public exposure of Stanford's Ponzi scheme that occurred around the time of the SEC's February 2009 filing, that shortly thereafter Pershing's relationship with SGC was widely publicized, and that Pershing's relationship with SGC was noted on many of Plaintiffs' account statements.  *Id*. at 11–12 (citing PER_APP_0634–52, 2833–35). Plaintiffs dispute that the filing of the SEC's Receivership Action alerted them to their potential claims against Pershing because it "focused solely on *Stanford's* wrongdoing . . . [whereas] Pershing was touted as the 'good guy' . . . ."  Pls.' Resp. 29 (emphasis in original).  Instead, Plaintiffs assert that they were put on notice of their claims when the *Turk* complaint, which included Plaintiffs as putative class members, was filed on November 18, 2009.  *Id.* at 28.

In furtherance of its stance, Pershing highlights that other plaintiffs filed suit against Pershing only two months after the February 2009 SEC filing, and argues that those filings

MEMORANDUM OPINION AND ORDER – PAGE 10

show that these Plaintiffs similarly were or should have been aware of their claims well in advance of the November 2009 *Turk* complaint.  Def.'s Br. 12 (citing PER_APP_0608). While the Court can take judicial notice of public federal court pleadings, the mere fact of other pleadings naming Pershing as a defendant does not demonstrate Plaintiffs' purported knowledge of their claims.  Reasonable minds could differ as to whether other suits predating the *Turk* complaint or any media coverage should have notified Plaintiffs of their potential claims against Pershing.  On this evidence, a genuine dispute of material fact exists as to when Plaintiffs discovered, or in the exercise of ordinary diligence would have discovered, that Pershing allegedly caused or contributed to their injuries.  Accordingly, the Court cannot hold as a matter of law that limitations began to run in February 2009.

### B. American Pipe *Tolling Applies to New Jersey State Law Claims*

Even if Plaintiffs' claims accrued as late as November 18, 2009, absent tolling, the statute of limitations would have run in November 2015, several months before Plaintiffs filed suit.  In an effort to save their claims, Plaintiffs invoke *American Pipe* tolling.  Under *American Pipe*, individual claims are tolled during the pendency of a class action suit until class certification is denied or the individual ceases to be a class member. *See* 414 U.S. at 554; *see also Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983).  Plaintiffs assert that, under this doctrine, their claims were tolled from November 18, 2009, the date the *Turk* complaint was filed, to, for certain Plaintiffs, June 25, 2010, the date the class definition in the *Turk* Case was modified to exclude certain Plaintiffs, and for others, May

MEMORANDUM OPINION AND ORDER – PAGE 11

5, 2016, the date of filing of this suit.[7]  Pls.' Resp. 32–34.  If applied in conjunction with the discovery rule, either of these periods of tolling would render Plaintiffs' claims timely.

*1. The Court predicts the New Jersey Supreme Court will recognize* **American Pipe** *tolling*. **–** The parties disagree about whether *American Pipe* tolling can apply to New Jersey state law claims, and, if it does, whether it can save Plaintiffs' claims.  The Supreme Court of New Jersey has never explicitly adopted or declined to adopt *American Pipe* tolling to New Jersey state law claims.  Thus, as a transferee court adjudicating this case based on diversity jurisdiction, this Court must make an *Erie* determination as to what New Jersey's highest court would decide if it were to address the issue itself.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Lower New Jersey state courts have applied *American Pipe* tolling in various state law contexts based in part on a recognition that the doctrine promotes the purpose of class action procedural rules — the "efficient utilization of judicial resources and the reduction of costs to individual litigants" — and that "New Jersey law has been hospitable to equitably purposed procedural devices in various situations."  *Staub v. Eastman Kodak Co.*, 726 A.2d 955, 964–67 (N.J. Super. App. Div. 1999); *see also Mungiello v. Fed. Express Corp.*, 2016 WL 6833070, at *4–5 (N.J. Super. Ct. App. Div.

---

[7] Plaintiffs simultaneously argue: (1) that all Plaintiffs remained members of the putative *Turk* class until the filing of the instant case, Pls.' Resp. 29, 32, (2) that all Plaintiffs were excluded from the *Turk* Case class definition on June 25, 2010, Pls.' Resp. 29, n. 34, and (3) that only Plaintiffs David Galassi, Janet Galassi, Steven Higginbotham, Elizabeth Brewster, and the Reid Family, LLP, can show they remained in the putative *Turk* class definition until the filing of this case, Pls.' Resp. 28–29, n. 33.  Because, as discussed below, Plaintiffs can take advantage of *American Pipe* tolling to render their claims timely under any of the preceding circumstances, the Court will not further address this inconsistency.

MEMORANDUM OPINION AND ORDER – PAGE 12

2016).  Based on these New Jersey state court opinions, this Court predicts that the New Jersey Supreme Court would adopt *American Pipe* tolling for New Jersey state claims.

**2. Plaintiffs can benefit from American Pipe tolling**. **–** Pershing argues that, even if *American Pipe* tolling is available, it does not save Plaintiffs claims.  Specifically, Pershing contends that, to the extent any Plaintiff dropped out of the putative *Turk* class definition on June 25, 2010, applying *American Pipe* tolling from November 18, 2009, to June 25, 2010, does not save Plaintiffs' claims if they accrued in February 2009.  Def.'s Br. 16–17 (asserting that, with 219 days of *American Pipe* tolling, the statute of limitations ran out on October 5, 2015).  However, as discussed in Section V.A, *supra*, the Court cannot say Plaintiffs' claims accrued in February 2009 as a matter of law.  If a jury found that the Plaintiffs' claims accrued as late as November 18, 2009, under the discovery rule, and the claims of any Plaintiffs that were excluded from the *Turk* class on June 25, 2010, are subject to *American Pipe* tolling until that date, those Plaintiffs would have had until June 2016, to file suit.  Under those circumstances, those Plaintiffs' May 5, 2016, complaint would be timely.

Additionally, Pershing argues that any Plaintiffs that were not excluded from the *Turk* class definition and thus remained in the putative *Turk* class at the time of filing this suit forfeited any tolling *American Pipe* would afford by filing suit before class certification was denied because "*American Pipe* tolling applies only to opt-out plaintiffs after the district court makes its class certification determination."  Def.'s Br. 16 (citing *Thomas v. Correctional Medical Servs., Inc.*, 2009 WL 737105, at *4 (D.N.J. 2009)).  At the time this suit was filed, the issue of class certification in the *Turk* suit had not yet been decided.

MEMORANDUM OPINION AND ORDER – PAGE 13

Class certification was not ultimately denied until March 2019.  Order (March 21, 2019) [198], in *Turk*.  Given Third Circuit jurisprudence regarding *American Pipe*'s applicability in similar circumstances, the Court rejects Pershing's argument.

       The Third Circuit has recently joined the Second, Ninth, and Tenth Circuits in recognizing *American Pipe* tolling's applicability to federal law claims of plaintiffs who opt out of a putative class and file an individual suit prior to class certification.  *Aly v. Valeant Pharm. Intl. Inc*., 1 F.4th 168, 174–74, 180 (3d Cir. 2021) (citing *In re Worldcom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007); *In re Hanford Nuclear Reservation Litigation*, 534 F.3d 986 (9th Cir. 2008); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223 (10th Cir. 2008)).  In its reasoning, the Third Circuit highlighted that *American Pipe* "may have been anticipated to apply most commonly in the post-certification context . . . [b]ut nothing in our precedent suggests that *American Pipe* applies *exclusively* to post-certification claims."  *Aly*, 1 F.4th at 178 (emphasis in original).  The Third Circuit also noted that affording *American Pipe* tolling to individual claims of plaintiffs that opt out of a class before a certification decision reflects a straightforward application of the principles underlying the doctrine.  *Id.*  Doing otherwise would be counterintuitive given "individual claims filed well before certification could be dismissed as untimely, while other claims filed at a much later date would be allowed to proceed. Class members who were 'contemplating opting out and filing their own lawsuits would be penalized for giving the defendants and the Court earlier notice.'"  *Id.* (quoting *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop*., 2019 WL 130535, at *8 (E.D. Pa. Jan. 8, 2019).

Looking to this Third Circuit precedent and recognizing that "New Jersey law has been hospitable to equitably purposed procedural devices," *Staub*, 726 A.2d at 964, this Court predicts that New Jersey Supreme Court would adopt and apply the same contours of *American Pipe* tolling as the Third Circuit in *Aly* to New Jersey state law claims, like Plaintiffs'. Accordingly, the Court anticipates that *American Pipe* tolling applies to the individual claims of Plaintiffs that were still included in the *Turk* putative class definition at the time of filing the instant suit. Under that interpretation, those Plaintiffs' claims are afforded tolling from November 18, 2009, the time of *Turk* Case filing, to May 5, 2016, the filing of this suit. If a jury found that Plaintiffs' claims accrued as late as November 18, 2009, under the discovery rule, this period of tolling would render those Plaintiffs' claims timely. Accordingly, for the reasons stated above, the Court declines to find any Plaintiffs' fraud or aiding and abetting fraud claims time-barred as a matter of law.[8]

## VI. PLAINTIFFS' CLAIMS FOR CDs PURCHASED BEFORE DECEMBER 27, 2005, ARE NOT BARRED AS A MATTER OF LAW

Pershing asks this Court to bar claims related to any SIBL CDs purchases made prior to December 27, 2005 — in particular, certain purchases by Plaintiffs Robert Gold, Bruce McLeod, and Kathleen McLeod — on the ground that they constitute impermissible holder claims. Def.'s Br. 38 (citing PER_APP_2540, 2541, 2573, 2575, 2576, 2581). The Court declines to find that these claims are barred as a matter of law.

---

[8] Plaintiffs also argue their claims were tolled from September 30, 2011, to May 21, 2012, while the *Turk* Case was stayed. Pls.' Br. 29, n. 34. Because genuine disputes of material fact preclude summary judgment on statute of limitations grounds even without this period of tolling, the Court does not address this argument for the purposes of this Order.

Although Pershing and SGC had no formal clearing relationship prior to December 27, 2005, Plaintiffs allege that Pershing made misrepresentations prior to this date that were indirectly relayed to them in the process of purchasing their SIBL CDs, or, alternatively, that Pershing's misrepresentations induced them to renew or refrain from redeeming their SIBL CDs.  Complaint ¶¶ 61–63, 96; Pls.' Resp. 37.  Claims alleging reliance in the form of failure to sell or purchase securities are often classified as "holder claims."  *In re WorldCom, Inc. Securities Litig.*, 2006 WL 752770, at *2 (S.D.N.Y. 2006) ("A 'holder' action is one in which the plaintiffs allege that material misrepresentations or omissions caused them to retain ownership of securities that they acquired prior to the alleged wrongdoing.").  In *Blue Chip Stamps v. Manor Drug Stores*, the United States Supreme Court barred such "holder claims" in the context of federal securities law but did not extend that holding to claims alleging inducement not to purchase or sell in the context of state common law claims.  *See* 421 U.S. 723, 755, 738, n.9 (1975) (noting that the disadvantage of barring holder claims in the Rule 10b-5 context "is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law").   However, no New Jersey court has ruled on the viability of holder claims in the context of common law fraud or indirect fraud.  Because no New Jersey court has precluded such claims, this Court will not do so now.

In support of its argument that holder claims are inviable under New Jersey law, Pershing highlights a portion of the reasoning of the United States District Court of New Jersey in *Gutman v. Howard Sav. Bank*, 748 F. Supp. 254 (D.N.J. 1990).  Def.'s Br. 6 n.2.  The *Gutman* court declined to impose a "purchase or sale requirement" on a New Jersey

MEMORANDUM OPINION AND ORDER – PAGE 16

common law fraud claim in part because the plaintiffs "had direct dealings with defendants in which the latter made certain of the representations complained of," which did not implicate any of the policy concerns associated with holder claims outlined in *Blue Chip Stamps*. *Gutman,* 748 F. Supp. at 266.  Plaintiffs' fraud claims here are indirect ones based on misrepresentations Pershing allegedly made to SGC financial advisors that were, in turn, communicated to investors like Plaintiffs.  Even so, the Court takes note that the *Gutman* court also reasoned that the "public policy underlying the actionability of fraud exists regardless of whether plaintiff is induced to act or refrain from action," and held "that the Supreme Court of New Jersey would decide that, as a general rule, reliance in a fraud or negligent misrepresentation claim consists of action or inaction induced by a misrepresentation."  *Id.* at 264.

Without a clear decision from a New Jersey court barring holder claims in the context of direct or indirect fraud claims, this Court will not exclude such claims here.  *See id.* at 266 ("In the absence of a decision on point from any New Jersey court, this Court will not impose a purchase or sale requirement.").  Accordingly, the Court declines at this time to find any Plaintiffs' claims based on Pershing's alleged inducement to hold their CD's purchased prior to December 27, 2005, inviable as a matter of law.

## VII. THE COURT DENIES SUMMARY JUDGMENT ON PLAINTIFFS' INDIRECT FRAUD CLAIMS

Pershing argues that Plaintiffs have not provided sufficient evidence to establish any of the elements of indirect fraud.  The Court disagrees.  Common law fraud under New Jersey law consists of five elements: "(1) a material misrepresentation of a presently

existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015) (internal quotation marks omitted). Plaintiffs' indirect fraud claims stem from the allegation that Pershing made fraudulent statements to SGC financial advisors that it intended to be relayed to investors, like Plaintiffs. Complaint ¶ 96. When a plaintiff hears a defendant's alleged misrepresentation from a third-party instead of directly from the defendant, that plaintiff may attempt to prove his or her fraud claim through the principle of indirect reliance. *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000); *Wilson v. McCann*, 2014 WL 5326173, at *5 (N.J. Super. Ct. App. Div. 2014). Indirect reliance is established where "a party to a transaction makes a false statement to another party, intending or knowing that the other party in the transaction will hear it and rely on it, and the second party to the transaction actually hears the substance of the misrepresentation, by means however attenuated, and considers the actual content of that misrepresentation when making the decision to complete the transaction." *Kaufman,* 754 A.2d at 1196–97.

To prevail on their indirect fraud claims, Plaintiffs will ultimately have to provide evidence showing that: (1) Pershing employees knowingly made material false statements to financial advisors at SGC; (2) Pershing intended for Plaintiffs to hear and rely on those materially false statements; (3) SGC financial advisors actually passed those false statements on to Plaintiffs; and (4) Plaintiffs actually and reasonably relied on those false statements in investing in the CDs. Pershing argues that there is no evidence of any of these elements. Def.'s Br. 27–28, 36 (citing *McCormac v. Qwest Commun. Intern., Inc.*,

MEMORANDUM OPINION AND ORDER – PAGE 18

904 A.2d 775, 784–85 (N.J. App. Div. 2006)).   However, the Court determines that a genuine dispute of material fact exists as to all elements of Plaintiffs' fraud claims. Accordingly, summary judgment on these claims is denied.

   *1. Plaintiffs' Evidence* – In response to Pershing's no-evidence assertions, Plaintiffs point to the sworn testimony of SFIS Trust Advisor Elias Barbar, SGC Financial Advisor Roberto Pena, and SGC Financial Advisor Randall Pickett,[9] as well as two written communications from Pershing in an effort to show that Pershing made misrepresentations about the SIBL CDs that were intended to be dispersed to SGC investors and were eventually passed on to and relied upon by Plaintiffs.

   Plaintiffs first provide testimony from Barbar regarding his comfort and reassurance concerning the SIBL CDs he found from Pershing's relationship with SGC, that he made a practice of explaining that relationship to potential investors, and that Pershing represented to SGC employees that Pershing had performed extensive due diligence on Stanford and encouraged the use of Pershing's reputation to sell the SIBL CDs.[10]   Pls.' Resp. 22 (citing Pl_App_0272–73 [62-3]).   Pena similarly testified that he was explicitly

---

[9] The Court rejects Pershing's argument that, because they did not directly advise any of the Plaintiffs, the testimony of Barbar, Pena, and Pickett is irrelevant to Plaintiffs' indirect fraud claims.  *See* FED. R. EV. 401.

[10] Pershing additionally argues Barbar's testimony should be disregarded because it contains hearsay, is conclusory, and lacks a foundation in personal knowledge.  The Court overrules the objections.  Barbar's statements that SGC employees told him that Pershing employees represented that Pershing was satisfied with the due diligence it performed on Stanford and recommended that financial advisors use Pershing's name to sell the SIBL CDs are not hearsay for the purposes of Plaintiffs' indirect fraud claims.  *See* FED. R. EV. 801(c), (d).  Barbar's testimony is sufficiently based on personal knowledge.  *See* FED. R. CIV. P. 56(c).

authorized to use the name Pershing to make the SIBL CDs "easier to sell" to potential investors.  Pls.' Resp. 23–24 (citing Pl_App_0312–454).   In Pickett's testimony, he explained the assurances Pershing representatives gave about the SIBL CDs, including that Stanford was "clean and clear," Pls.' Resp. 25 (citing Pl_App_0281), as well as its involvement in his SGC financial advisor recruiting process.  *Id.*

In addition to that testimony, Plaintiffs point to two written communications from Pershing that they contend contain misinformation that "induced the holders of the CDs to refrain from redeeming" to support its claims.  Pls.' Resp. 26.  The first communication is an email dated October 3, 2008, from Pershing Chief Executive Officer, Richard Brueckner's, email address to all SGC financial advisors (the "Brueckner Email").  *Id.*; Pl_App_0080–81.  Brueckner testified that the intended purpose of this communication was to comfort investors and clients.  Pls.' Resp. 26; *see* Pl_App_0082.  The second communication was a bulletin from December 12, 2008 (the "Pershing Bulletin") which contained a sample letter financial advisors could send to their customers to "assure [them] that the safety and security of [their] assets are of paramount importance . . . ."[11] Pl_App_0083; *see also* Pl_App_0083–86.

---

[11] The Court rejects Pershing's argument that the Brueckner Email and Pershing Bulletin are irrelevant to Plaintiffs' indirect fraud claims.  Unlike in *Weatherly*, where this Court found that these communications could not establish direct inducement under Florida law because they were not "particular to the Stanford CDs," "primarily consist of information about Pershing," and "were not sent to nor do they attempt to directly address investors," Plaintiffs' claims are claims of indirect reliance under New Jersey law.  Order (June 23, 2015) at 5–6 [47], in *Weatherly, et al. v. Pershing, LLC*, Case No. 3:14-cv-0366-N (N.D. Tex. 2018).

MEMORANDUM OPINION AND ORDER – PAGE 20

*2. Pershing has not demonstrated entitlement to judgment as a matter of law.* – After reviewing the evidence on the record, the Court disagrees with Pershing's assertion that there is no evidence to support any element of indirect fraud. Plaintiffs have identified evidence sufficient to create fact issues regarding whether Pershing made material misrepresentations to SGC financial advisors, whether it intended for Plaintiffs to hear and rely on the alleged misrepresentations, whether SGC financial advisors relayed any of Pershing's alleged misrepresentations to Plaintiffs, as well as whether Plaintiffs actually or reasonably relied on the alleged misrepresentations in investing in SIBL CDs. The Court addresses the disputed elements in turn.

First, Pershing argues there is no evidence of any actionable misstatement Pershing made that could have indirectly reached Plaintiffs — that even if Pershing had made statements regarding being satisfied with due diligence of SGC to the financial advisors that advised these Plaintiffs, which Pershing does not concede occurred, such general statements are statements of opinion which are too vague to be material. Def.'s Br. 28–30. In furtherance of this position, Pershing cites a number of cases standing for the general proposition that vague statements constitute mere puffery and are not actionable. Def.'s Br. 30. For a statement to be actionable in the context of common law fraud, "[t]he 'plaintiff must show the misrepresentation of a fact that exists at or before the time the representation is made.'" *Shtutman v. Carr*, 2017 WL 4402045, at *4 (N.J. Super. App. Div. 2017) (quoting *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 29 (App. Div. 2012)). "A statement is a matter of fact if it is 'susceptible of exact knowledge when the statement was made,'" as compared to mere puffery, "a matter of opinion [that] 'it is unsusceptible of

MEMORANDUM OPINION AND ORDER – PAGE 21

proof' at that time." *Shtutman*, 2017 WL 4402045, at *4 (quoting *Joseph J. Murphy Realty, Inc. v. Shervan*, 159 N.J. Super. 546, 551 (App. Div. 1978)) (internal quotations omitted)).

In response, Plaintiffs assert that Pershing made representations about its backing of Stanford and satisfaction with its due diligence on SIBL, including statements to the effect that SIBL was "clean and clear," while "knowing full well that its due diligence into SIBL and Allen Stanford had resulted in many troubling issues and unanswered questions." Pls.' Resp. 22; *see also* Pl_App_0041; Pl_App_0037; Pl_App_0281.   Contrary to Pershing's contentions, these alleged fraudulent statements go beyond mere puffery. *Compare In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428, n.14 (3d Cir.1997) ("Similarly, vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such."), *with In re Bank of Am. Corp. Securities, Derivative, and Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (distinguishing "opinion-based statements that are anchored in 'misrepresentation of existing facts'" from puffery in the context of securities fraud).   Thus, the alleged misstatements concerning the financial legitimacy of SIBL, SGC, and the SIBL CDs can support a claim for fraud.

Next, Pershing asserts that no evidence shows that any alleged misrepresentations it made to SGC financial advisors "actually reached Plaintiffs, let alone that Pershing intended those statements to reach Plaintiffs and intended that Plaintiffs rely on those statements." Def.'s Br. 33.  However, Plaintiffs contend that the Brueckner Email, and the Pershing Bulletin demonstrate that Pershing's statements were intended "to be passed on

MEMORANDUM OPINION AND ORDER – PAGE 22

to *all* of the clients of the Stanford-related companies, *regardless of whether Pershing knew specifically who they were and whether the clients had invested in the SIBL CDs*." Pls.' Resp. 27 (emphasis in original). Indeed, the Pershing Bulletin includes a "sample letter" that firms "may choose to deliver to [their] clients regarding the protection and security that is offered to accounts held in custody at Pershing." Pl_App_0084. Thus, evidence on the record consists of: the Pershing Bulletin, Brueckner's testimony that the Brueckner Email was designed to reassure advisors and clients that Pershing was a "sound financial institution," Pl_App_0082, and testimony from the financial advisors that Pershing encouraged SGC advisors to use the Pershing name to sell CDs. This evidence, combined with the fact that Plaintiffs were advised and sold SIBL CDs through SGC financial advisors, could lead a reasonable jury to find that Pershing intended the representations it made to SGC financial advisors to reach SGC clients, including Plaintiffs, for those clients to rely on them, and that those representations were conveyed to Plaintiffs.

Finally, Pershing maintains that there is no evidence that Plaintiffs actually relied on any alleged indirect misrepresentation of Pershing in making their SIBL CD investment decisions because neither Pershing's general involvement with SGC nor any instillation of a "general feeling of comfort" regarding the SIBL CDs can establish actual reliance. Def.'s Br. 34–35 (citing PER_APP_2464). Pershing points out that "not a single Plaintiff here has established what information he or she relied upon in making an individual investment decision to purchase a SIBL CD," as compared to information generally conveyed by SGC financial advisors to investors at large Def.'s Reply 22. Although Pershing is correct that each Plaintiff will ultimately need to demonstrate what representations they relied on

MEMORANDUM OPINION AND ORDER – PAGE 23

individually in order to recover, the Court at this juncture must credit all evidence on the record and indulge all reasonable inferences in favor of the nonmovant Plaintiffs. Indulging all reasonable inferences in Plaintiffs' favor, the evidence of the pervasive practice of SGC financial advisors using Pershing's name and assurances in recommending the SIBL CDs to investors, and Plaintiffs' CD purchases being facilitated by SGC financial advisors is sufficient to establish a genuine dispute of fact as to whether Plaintiffs actually or justifiably relied on any alleged indirect misrepresentation of Pershing.

Having considered the relevant and admissible evidence, the Court determines that Plaintiffs have raised fact issues regarding each element of their indirect fraud claims sufficient to survive summary judgment.

### VIII.  THE COURT DENIES SUMMARY JUDGMENT ON PLAINTIFFS' AIDING AND ABETTING FRAUD CLAIMS

Finally, Pershing argues Plaintiffs cannot establish any element of their aiding and abetting fraud claims. "The standard for civil aiding and abetting liability which has been adopted by the Third Circuit and New Jersey courts is the one set forth in the Restatement of Torts." *Cafaro v. HMC Intern., LLC*, 2009 WL 1622825, at *4 (D.N.J. 2009) (citing *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir. 1998); *Judson v. Peoples Bank Trust & Co.*, 134 A.2d 761, 767 (N.J. 1957)).   Section 876(b) of the First and Second Restatements of Torts provides for liability of a party that "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."   RESTATEMENT (SECOND) OF TORTS § 876(b) (1979); RESTATEMENT (FIRST) OF TORTS § 876(b) (1939).  More specifically, Plaintiffs here must

MEMORANDUM OPINION AND ORDER – PAGE 24

show: (1) Stanford's fraud against Plaintiffs, (2) that Pershing was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance," and (3) Pershing knowingly and substantially assisted the underlying fraud. *Any Garment Union, LLC v. Dry Clean Express I, LLC*, 2022 WL 14995413, at *11 (N.J. App. Div. 2022), cert. denied, 298 A.3d 354, 254 N.J. 506 (N.J. 2023), and cert. denied, 298 A.3d 354, 254 N.J. 507 (N.J. 2023) (quoting *State, Dept. of Treas., Div. of Inv. ex rel. McCormac*, 904 A.2d at 784 (internal citations omitted)); *see also Delzotti v. Morris*, 2015 WL 5306215, at *8 (D.N.J. 2015). A genuine dispute of material fact exists regarding all elements of aiding and abetting fraud. Accordingly, the Court denies summary judgment on these claims.

First, Pershing asserts that Plaintiffs have failed to prove an independent wrong — that is, SGC or the Stanford Entities' fraud. As stated in Section VII, *supra*, to establish common law fraud under New Jersey law, a plaintiff must demonstrate: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co.*, 117 A.3d at 1231 (internal quotation marks omitted). Pershing argues Plaintiffs have not provided admissible evidence of the principal fraud violation because they rely on findings in previous cases. Def.'s Br. 21; Def.'s Reply 12. Plaintiffs point to previous rulings of this Court noting that "'Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud,'" and that "'[e]ach Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent

MEMORANDUM OPINION AND ORDER – PAGE 25

the appearance of legitimacy to the entirety of Stanford's fraudulent enterprise,'" and that SGC was Stanford's broker-dealer in the United States.  Pls.' Resp. 11 (quoting Order (July 30, 2012), in *In re Stanford Int'l Bank, LTD*., Civil Action No. 3:09-cv-0721-N (N.D. Tex.) at 36 [176]; citing *Janvey v. Alguire*, 2013 WL 2451738, at *2–3 (N.D. Tex.), aff'd sub nom. *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014)).  The Court notes its previous rulings regarding the underlying Stanford Entities fraud, the alleged principal fraud here.

Next, Pershing maintains that no evidence has been put forth that it possessed knowledge of SGC or anyone else's fraud, touting "actual knowledge," as the standard for aiding and abetting liability, as contrasted with general awareness or knowledge of red flags.  Def.'s Br. 21–22.  Pershing correctly notes that aiding and abetting liability in the context of a securities violation requires actual knowledge of the violation on the part of the aider and abettor.  *See Cafaro*, 2009 WL 1622825, at *4 ("Thus, 'an aider and abettor must willfully and knowingly associate himself with another's unlawful act.'") (quoting *Failla*, 146 F.3d at 158).  However, the Third Circuit has determined that this requirement is "less strict where the alleged aider and abettor derives benefits from the wrongdoing." *Gould v. Am.-Hawaiian S. S. Co.*, 535 F.2d 761, 780 (3d Cir. 1976).  In such a case, a plaintiff must establish the alleged aider and abettor's "conscious involvement in impropriety or constructive notice of intended impropriety," *Gould*, 535 F.2d 761, 780, which can be demonstrated by a showing "that the alleged aider-abettor 'had general awareness that [its] role was part of an overall activity that [was] improper.'"  *Monsen v. Consol. Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir. 1978) (quoting *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974)).  The Third Circuit, like the New Jersey courts, looks

MEMORANDUM OPINION AND ORDER – PAGE 26

to the Restatement of Torts for the requirements of aiding and abetting liability. Accordingly, the aiding and abetting standard laid out in *Monsen* and *Gould* is equally applicable to Plaintiffs' claims for aiding and abetting fraud under New Jersey law.

Under this standard, Plaintiffs have satisfied their burden of establishing a genuine dispute of material fact regarding whether Pershing possessed the requisite knowledge of Stanford's fraud to impose aiding and abetting liability. Pershing derived substantial benefits from Stanford's wrongdoing by nature of its clearing relationship. Although some Pershing employees testified that they were unaware that Stanford was running a Ponzi scheme, *see, e.g.,* PER_APP_1030–31, 1356–78, Pershing admits that it had concerns about the Stanford enterprise, including the substantial amount of Stanford's revenue stemming from SIBL CDs, and acted as its clearing broker for a period time despite those concerns. Def.'s Br. 22 (citing PER_APP_1184–85; 0342, 1661–62, 1665–66, 1903–04); *see also* Pl_App_0047–51. Moreover, Plaintiffs identify "two Pershing internal 'incident reports'[12] in conjunction with the testimony of Pershing [executive] employees George W. Arnett, III [,] Richard Closs," and John Ward, arguing that those documents demonstrate that "Pershing had been aware since 2006 of ongoing suspicious and fraudulent activity by SIBL and SGC." Pls.' Resp. 12. In particular, Plaintiffs highlight an email exchange from 2006, in which "Richard Closs raised the possibility that Allen Stanford's personal funding of SGC might simply be coming from the money taken in by SIBL for the CDs, *i.e.* that

---

[12] Pershing raises several objections to Plaintiffs' use of the incident reports. Namely, that they are subject to Suspicious Activity Report privilege under Federal Rule of Evidence 402. Def.'s Reply 14. Because there are genuine disputes of material fact even without considering the incident reports, the Court declines to consider the objections.

Stanford was engaged in a fraudulent scheme[.]" Pls.' Resp. 19, 20 (citing Pl_App_0065–67).   Similarly, John Ward, Pershing's Managing Director in the Global Securities Services, provided an affidavit in which he testified that a review of SGC's financials raised questions about SIBL and recounted SGC's refusal to comply with an independent financial audit despite Pershing's persistent requests for information.  Pls.' Resp. 16 (citing Pl_App_0041).

Although Pershing posits that this evidence demonstrates nothing more than "red flags" insufficient to impose aiding and abetting liability, a reasonable juror could find that Pershing derived benefit from Stanford's wrongdoing, and, at a minimum, possessed a general awareness that it was participating in "'overall activity that [was] improper'" based on Pershing's continuous support and relationship with Stanford despite Stanford's suspicious business model  *Monsen*, 579 F.2d at 799 (quoting *Coffey*, 493 F.2d at 1316). After considering the relevant and admissible evidence, the Court determines a genuine dispute of material fact exists regarding Pershing's knowledge of SGC's alleged fraud. Whether Pershing was consciously involved in or had constructive notice of SGC's fraud is properly left to a jury to determine.

Additionally, Pershing argues Plaintiffs cannot prove that Pershing substantially assisted Stanford's fraud.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  *Lord Abbett Inv. Tr.-Lord Abbett Short Duration Income Fund v. Valeant Pharm. Intl., Inc.*, 2018 WL 3637514, at *6 (D.N.J. 2018) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)).  Pershing correctly notes that the provision of routine or

MEMORANDUM OPINION AND ORDER – PAGE 28

ministerial clearing services is not substantial assistance. *See Guerrier*, 1993 WL 90404, at *8.  However, like the plaintiffs in related case, *Turk*, Plaintiffs have identified evidence that Pershing's services were more than ministerial or routine. *See Turk v. Pershing LLC*, 2023 WL 36080, at *6 (N.D. Tex. 2023).  Plaintiffs assert that Pershing substantially assisted SGC by lending "credibility to the Stanford enterprise," by "actively assisting in the recruitment of [financial advisors] for SGC," and by "'selling the Pershing face'" to SGC financial advisors that recommended SIBL CDs to investors, as well as "issuing account statements with its name at the bottom of each page" to investors.  Pls.' Resp. 20–21.  What's more, Plaintiffs contend Pershing did all this "despite knowing that SGC was insolvent." Pls.' Resp. 20.  There is evidence on the record, outlined above, from which a reasonable juror could find that these alleged actions occurred and constituted affirmative assistance or helped conceal Stanford's wrongdoing.

Finally, Pershing contends that Plaintiffs lack evidence of causation, characterizing Plaintiffs' argument as follows: "[Plaintiffs] do not contend that Pershing substantially assisted in *their* CD purchases.  Rather, they claim that Pershing generally aided the Ponzi scheme . . . ." Def.'s Br. 23 (emphasis in original).  Through this lens, Pershing argues that its alleged bolstering of Stanford's scheme is not causally connected to Plaintiffs' harm, citing persuasive authority for the proposition that an alleged aider and abettor's substantial assistance must be a "substantial factor" in causing injury.  Def.'s Br. 24 (citing *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1135 (C.D. Cal. 2003); *Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir.1985); *Impac Warehouse Lending Grp. v. Credit Suisse First Boston LLC*, 270 F. App'x 570, 572 (9th Cir. 2008)).  The actions Plaintiffs allege

MEMORANDUM OPINION AND ORDER – PAGE 29

substantially assisted in causing their injuries are supported by evidence in the record.  In particular, evidence that Pershing led financial advisors to believe it was Stanford's partner, actively recruited and assisted in transitioning financial advisors to Stanford, encouraged the use of Pershing's name to sell SIBL CDs, processed wire transfers for SGC, and allowed its name to be used on account statements issued to SGC investors, like Plaintiffs, which lent credibility to the scheme.  Indulging all reasonable inferences in Plaintiffs' favor, the evidence on the record is sufficient to create a fact issue as to whether Pershing's alleged substantial assistance of Stanford's fraud contributed to or was a substantial factor in causing Plaintiffs' injuries.  Accordingly, summary judgment on Plaintiffs' aiding and abetting fraud claims is denied.

### CONCLUSION

Plaintiff Eric Challain's claims are dismissed with prejudice.  Because Plaintiffs did not answer Pershing's no-evidence assertions regarding their breach of third party intended beneficiary contract claims, the Court grants summary judgment on those claims.  However, Plaintiffs' aiding and abetting fraud and indirect fraud claims remain.  The Court cannot conclude as a matter of law that those claims are time-barred.  Moreover, Plaintiffs have raised fact issues regarding all elements of aiding and abetting fraud and indirect fraud claims.  Accordingly, Pershing is not entitled to judgment as a matter of law.  The Court denies summary judgment on those claims.

Signed July 8, 2024.


David C. Godbey
Chief United States District Judge